UNITED STATES BANKRUPTCY COURT
<u>NORTHERN DISTRICT OF NEW YORK</u>

In re:

|  |  |
|---|---|
| Cleon L. Ford, | Case No. 07-31540<br>Chapter 7 |
| Debtor. |  |

Appearances:

| | |
|---|---|
| Kall and Reilly LLP<br>Attorneys for Debtor<br>P.O. Box 189<br>Red Creek, New York 13142 | Richard G. Reilly, Jr., Esq. |
| The Crossmore Law Office<br>Attorneys for Community Bank, N.A.<br>115 West Green Street<br>Ithaca, New York 14850 | Edward Y. Crossmore, Esq. |
| Chapter 7 Trustee<br>P.O. Box 787<br>Cortland, New York 13045 | Mary E. Leonard, Esq. |

Hon. Margaret Cangilos-Ruiz, U.S. Bankruptcy Judge

## MEMORANDUM-DECISION

On June 7, 2007, Cleon L. Ford ("Debtor"), a resident of Cayuga County, filed his bankruptcy petition for relief under chapter 7 of the United States Bankruptcy Code.[1] On his Schedule C, Claim of Exempt Property, Debtor listed two parcels of real property that he claimed as exempt homestead.

---

[1] 11 U.S.C. §§101–1532 (2009) ("Code").

1

On July 19, 2007, Community Bank, N.A. ("Bank") moved to limit or disallow Debtor's claim of homestead exemption.[2] The chapter 7 trustee ("Trustee") separately objected to Debtor's claim of homestead exemption. An initial hearing on the objections was held on August 23, 2007. At the hearing, Debtor's counsel stated his intention to file a related motion under Code section 522(f) ("522(f) motion") to avoid Bank's judicial lien as impairing Debtor's homestead exemption. The court directed the Debtor to file the 522(f) motion so it could be heard concurrently with the Bank's and Trustee's objections.

Pursuant to the court's scheduling order, the parties stipulated to the uncontested facts. The Debtor filed his 522(f) motion, which the Bank opposed. The Bank filed its list of exhibits, pretrial statement and memorandum of law. The court conducted an evidentiary hearing on November 27, 2007, at which time the court heard testimony from the Debtor, the Bank's appraiser, Kenneth Gardner, the Debtor's appraiser, William J. Anderson, and Rosemary Donnelly, a member of the Cato Planning Board. At the conclusion of the hearing, the court permitted additional briefing by the parties. The Bank filed a memorandum and supplemental letter to which the Debtor responded. This memorandum-decision incorporates the court's findings of fact and conclusions of law as permitted by Federal Rule of Bankruptcy Procedure 7052 as made applicable by Federal Rule of Bankruptcy Procedure 9014.

## FACTUAL BACKGROUND

**Stipulated Facts**

The Bank recovered judgment on a promissory note against the Debtor in the amount of $116,877.44 on March 8, 2006, in New York Supreme Court, Onondaga County. A transcript of the judgment was filed in the Cayuga County Clerk's office on April 4, 2006. On August 18,

---

[2] Bank also sought in its motion relief from the automatic stay as to a 1986 International Tandem Tractor. This portion of the motion was separately granted and is not addressed herein.

2

2006, the Bank commenced a special proceeding against the Debtor pursuant to New York Civil Practice Law and Rules ("NYCPLR") section 5206 to determine Debtor's homestead rights and to obtain an order directing a sheriff's sale of three parcels of Debtor's real property. A trial was scheduled to commence in state court on June 8, 2007, but was stayed by Debtor's filing for bankruptcy on June 7, 2007.

Debtor listed ownership of three parcels of real property in Cayuga County on Schedule A of his petition as follows: (1) "Two buildings on 79.8 acres on Jordan Road, Jordan, NY valued at $130,500.00 Tax map # 59.00-1-15.2 Homestead" ("Main Parcel"), (2) "3 acre building lot on Jordan Road, Jordan, NY valued at $11,000.00 tax map # 59.00-1-15.1" ("Road Frontage Parcel"), and (3) "68 acres of wooded and farm land on Jordan Road, Jordan, NY tax map # 59.00-1-06.212" ("Third Parcel"). Debtor claims the Main Parcel and Road Frontage Parcel as exempt homestead under NYCPLR section 5206(a). N.Y. C.P.L.R. § 5206(a) (Consol. 2008). The parties have stipulated that the Main Parcel consists of 79.8 acres fronting on Jordan Road, on which there are two permanent structures and a trailer owned by Debtor. The parties further stipulated that the Road Frontage Parcel, contiguous to the Main Parcel and also fronting on Jordan Road, contains the well and septic system that supports the facilities on the Main Parcel. The Third Parcel, which is not claimed as exempt, consists of 72.7 acres of farmland, woodland and swampland.[3]

At the time of filing, four mortgages encumbered one or more of the parcels. Wells Fargo holds two mortgages totaling $7,294.28 that encumber the Main Parcel. First Niagara Bank holds a mortgage totaling $66,375.94 that encumbers the Main Parcel and the Road Frontage Parcel. Mr. and Mrs. Patchen hold a mortgage totaling $11,649.78 that encumbers the

---

[3] The court notes that the acreage of the Third Parcel in the Stipulation of Facts and on Debtor's Schedule A is not the same. The difference does not affect the court's analysis.

3

Third Parcel. In addition, the Internal Revenue Service holds a lien for $27,764.92 against all three parcels due to tax warrants.[4]

**Testimony**

At the hearing, Debtor testified that the two permanent structures on the Main Parcel are a 40' x 60' unheated storage building where Debtor and his brother store equipment ("Storage Building") and a 45' x 66' garage building where Debtor and his brother work on equipment ("Garage Building"). Near the Garage Building on the Main Parcel is a 600-square-foot trailer where Debtor sleeps that does not have running water but has electricity ("Trailer"). Attached to the Garage Building is a 952-square-foot addition ("Addition") developed as an office area that contains Debtor's only water, laundry and toilet facilities. Debtor testified that he "resides" in the Addition but sleeps in the Trailer. Debtor also testified that he uses the Trailer and Addition as living space. Debtor testified that although he receives monthly rent from his brother for use of the Garage Building, Debtor also utilizes the Garage Building for personal use. Debtor testified that he does not receive rent from his brother for use of the Storage Building.

**Appraisals**

Debtor and the Bank each submitted appraisals as to the value of the land and the value of the improvements. The appraisals are compared and summarized below, and the relevant facts will be incorporated as part of the analysis of Debtor's 522(f) motion.[5]

*Land Value*

Below is a table summarizing the comparable sales found in Bank's and Debtor's appraisals and comparing the resulting land values with a discussion of each following the table.

---

[4] See Letter from Edward Y. Crossmore to the Bankruptcy Court dated November 1, 2007, that accompanied the Joint Stipulation of Facts.
[5] Debtor's appraisal was received as Debtor's Exhibit A, which incorporated three comparable sales. Bank's appraisal was received as Creditor's Exhibit 1, which incorporated comparable sales numbered one through four pertaining to land value and comparable sales numbered five through eight pertaining to improvements value.

| Land Value ||||||
| Debtor's Appraisal (Sales Comparison Approach) ||| Bank's Appraisal (Sales Comparison Approach) |||
| Comparables | Adjustments | Unit Value | Comparables | Adjustments | Unit Value ||
| | | | | | Tillable | Non-tillable |
| Sale 1 $483/acre | +15% (date) -5% (size) | $527/acre | Sale 1 $2,267/acre (tillable) $1,000/acre (non-tillable) | -20% (Location) -20% (dev. potential) | $1,360/acre | $600/acre |
| Sale 2 $532/acre | +15% (date) -8% (size) | $563/acre | Sale 2 $904/acre (tillable) | -10% (size) | $904/acre | n/a |
| Sale 3 $684/acre | +0% (date) -20% (size) | $547/acre | Sale 3 $822/acre (non-tillable) | -10% (size) +10% (dev. potential) | n/a | $822/acre |
| | | | Sale 4 $1,346/acre (tillable) $500/acre (non-tillable) | -10% (size) +10% (dev. potential) | $1,346/acre | $500/acre |
| **Appraised Value** || **$550/acre** | **Appraised Value** | | **$1,250/acre** | **$650/acre** |

Both appraisals utilized the sales comparison approach, arriving at an appraised value by comparing recent sales of similar properties.

Debtor's appraiser, William J. Anderson ("Bank's Appraiser"), relied on three comparable sales of vacant land to appraise Debtor's land. Since all three properties are in the direct vicinity of Debtor's property, no adjustments were made for location. Two of the sales occurred in the year 2000, so each price was adjusted upward by a factor of 15% to account for

5

increased property values on the date of the appraisal.[6] The resulting land unit values ranged from $527.00 to $563.00 per acre of land, and Debtor's appraiser utilized a unit value of $550.00 per acre to calculate the value of Debtor's property.

Kenneth Gardner, Bank's appraiser ("Bank's Appraiser"), relied on four comparable sales to appraise Debtor's vacant land.[7] The resulting land unit values were $1,250.00 per acre for tillable land and $650.00 per acre for the balance.

*Improvements Value*

The Bank's and Debtor's appraisals separately ascribe a value for the improvements, as summarized in the below tables. Debtor's Appraiser assigned a total dollar value for the improvements based upon the replacement cost and the Bank's Appraiser calculated a value for the improvements after first assigning a value per square foot based on comparables.

| *Debtor's Appraisal of Total Value (Cost Approach)* | | |
|---|---|---|
| Estimated Replacement Cost | Adjustments | Resulting Value |
| Main Building $133,971 | -56% (depreciation) | $58,947 |
| Storage Building $24,552 | -45% (depreciation) | $13,504 |
| **Appraised Value** | | **$72,451** |

---

[6] The only other adjustments Debtor's appraiser made were downward adjustments for each comparable sale to reflect that they are smaller properties, which usually sell for higher unit prices than do larger parcels.

[7] Bank's appraiser made several adjustments. The first sale had a better location along a river and extensive road frontage, making it more desirable for development, so the net adjustment for location and development potential was a 40% reduction. The second, third and fourth parcels were reduced by 10% due to their smaller size, and the third and fourth sales were adjusted upward by 10% each due to limited or steep road frontage.

Debtor's appraiser used the cost approach, based on replacement costs adjusted for depreciation, to calculate the value of the improvements. Debtor's appraiser testified that he selected the cost approach as the most appropriate method due to his assertion of the lack of sales of comparable properties and his assessment that the buildings are in relatively good condition. Debtor's appraiser consulted the Marshall & Swift Valuation Service to estimate building costs for the improvements and arrived at a total value for the improvements of $72,451.00. Debtor's appraiser added $10,000.00 to the total appraised value as "Enhancement Value of Site Improvements" to account for the value added to the land due to the improvements.

| *Bank's Appraisal of Square Footage Value* <br> *(Sales Comparison Approach)* | | |
|---|---|---|
| Comparables | Adjustments | Resulting Value |
| Sale 5 <br> $33.33/sq. ft. | -15% (location) <br> -10% (size) <br> +10% (other bldg.) | $28.33/sq. ft. |
| Sale 6 <br> $18.84/sq. ft. | -10% (size) <br> +10% (quality) <br> +10% (site) <br> +10% (other bldg.) | $22.61/sq. ft. |
| Sale 7 <br> $24.31/sq. ft. | -25% (location) <br> +10% (size) <br> +10% (site) <br> +10% (other bldg.) | $25.53/sq. ft. |
| Sale 8 <br> $20.76/sq. ft. | +10% (condition) <br> -10% (other bldg.) <br> +15% (sale condition) | $23.87/sq. ft. |
| **Appraised Value** | | **$25.00/sq. ft.** |
| **Total Improvements Value Based on Square Footage (3,920 sq. feet of buildings)** | | **$98,000** |
| **Combined Building Value Exclusive of Land Value** | | **$83,000** |

7

Bank's appraiser, utilizing the sales comparison approach, relied on four sales of improved land to arrive at a value for Debtor's land containing the building improvements as well as the improvements themselves. Bank's appraiser arrived at a square footage value for each comparable sale, calculated by taking the property sale price and dividing it by the square footage of the building located on the property.[8] Percentage adjustments were then made based on numerous factors.[9]

In order to arrive at a value for the improvements, Bank's appraiser apportioned value between land value and improvements value. The square footage value of $25.00 was multiplied by the square footage of the main building. The result, $98,000.00 was then apportioned among the Garage Building, the Storage Building, and the five-acre "Building Site," a two-acre portion of the Main Parcel plus the three-acre Road Frontage Site. The apportionment gave a resulting land value of $3,000.00 per acre. The combined building value was $83,000.00, exclusive of land value.

## DISCUSSION

The court will first address the objections to Debtor's homestead exemption and then Debtor's lien avoidance 522(f) motion.

---

[8] Only one of the comparable sales had more than one building on the property, and in that case, Bank's appraiser used only the square footage of the main building to calculate the square footage value.

[9] Bank's appraiser made several adjustments: The fifth and seventh sales were reduced by 15% and 25%, respectively, due to their location in superior commercial areas. The sixth and seventh sales were increased by 10% due to smaller sites. The fifth, sixth and seventh sales were increased by 10% to account for the contributing value of the storage building on Debtor's property and the eighth sale was decreased by 10% because the storage building on that site is larger than that on the Debtor's property. The eighth comparable sale had more than one building on the property, and Bank's appraiser used the square footage of only the main building to calculate the square footage value. The eighth sale was also increased by 15% because the sale was a post-business-failure liquidation. The fifth and sixth sales were reduced by 10% due to smaller buildings and the seventh sale was increased by 10% due to a larger building on the site. The sixth sale was increased by 10% because the building was of inferior quality. The eighth sale was increased by 15% because the condition of the building was inferior.

**Homestead Exemption**

NYCPLR section 5206(a) states:

> (a) Exemption of homestead. Property of one of the following types, not exceeding fifty thousand dollars in value above liens and encumbrances, owned and occupied as a principal residence, is exempt from application to the satisfaction of a money judgment, unless the judgment was recovered wholly for the purchase price thereof: 1. A lot of land with a dwelling thereon . . ..

New York first established the homestead exemption in 1850. 11-52 Jack B. Weinstein et al., *New York Civil Practice: CPLR* P 5206.02. Seven years later, the New York Court of Appeals explained the purpose of the homestead exemption in *Robinson v. Wiley*:

> The statute is founded upon considerations of public policy, and has introduced a new rule in regard to the extent of property which shall be liable for a man's debts. The legislature were of opinion, looking to the advantages belonging to the family state in the preservation of morals, the education of children, and possibly even, in the encouragement of hope in unfortunate debtors, that this degree of exemption would promote the public welfare, and perhaps in the end, benefit the creditor.

15 N.Y. 489, 494 (1857). The homestead exemption has been modified by the legislature at different times, presumably because changing conditions merited a response from the legislature to better carry out the purpose of the homestead exemption. For example, condominiums and cooperatives were not expressly entitled to the homestead exemption until August 22, 1977, and the exemption for mobile homes was not effective until June 26, 1980. 11-52 Jack B. Weinstein et al., *New York Civil Practice: CPLR* P 5206.05 n.2. In addition, prior to August 22, 1977, homeowners had to comply with certain filing requirements to designate the property as a homestead, but since then, the exemption applies automatically to qualified property. *Id.* The most recent change to the homestead exemption was the change in allowable amount, which is discussed below.

The court will first address whether two separate tax parcels can be considered one lot for the purpose of the homestead exemption and whether either of Debtor's two parcels qualifies for the exemption as homestead under New York law.

In resolving a homestead objection in a case where a debtor owned two parcels, former Chief Judge Gerling from this district found that a separately-deeded parcel that was used in conjunction with a residential parcel for residential purposes qualified for the homestead exemption. *In re Flatt*, 160 B.R. 497 (Bankr. N.D.N.Y. 1993). In *Flatt*, a second parcel, purchased separately and located across the street from the debtors' residence, had a storage shed for garden tools and additional parking space. The court noted that "the creation of a homestead is largely a question of fact based primarily on a determination of the owner's intent." *Id.* at 501. The court found that it was the debtors' intent to use both parcels, which were commonly owned, for residential purposes. Noting that exemption statutes are to be construed liberally in favor of debtors, the court found that the two parcels qualified as one "lot of land" for the purposes of claiming the homestead exemption in New York. *Id.* at 501–02.

Similar to the facts before the court in *Flatt*, Debtor owns both the Main Parcel and the Road Frontage Parcel. No source of water or septic system exists to support the residential facilities on the Main Parcel other than those located on the Road Frontage Parcel, and the Main Parcel would be uninhabitable without water or sewer services. As evidenced by his testimony, Debtor's intent is clearly to use both properties as his residence. The court finds that both the Main Parcel and the Road Frontage Parcel are being used for residential purposes and that they qualify together as one lot of land that Debtor may claim as exempt. Accordingly, the portions of Trustee's and Bank's motions objecting to Debtor's claim of homestead exemption as to two separately-deeded parcels are denied.

The court will next consider the appropriate dollar amount of homestead exemption that Debtor can claim. On August 30, 2005, New York amended NYCPLR section 5206, increasing the amount New York debtors can claim as exempt homestead from $10,000.00 to $50,000.00. Bank argues that since Bank's claim arises out of a contract Debtor made with Bank before the amended statute's effective date, the amount of homestead exemption available to Debtor when he entered into the contract should control what he can claim now.

This very issue was recently addressed by the Second Circuit in *CFCU Community Credit Union v. Hayward.* 552 F.3d 253 (2d Cir. 2009). The court held that "debtors who file a bankruptcy petition after the [amendment to NYCPLR 5206's] effective date are entitled to invoke the greater homestead exemption amount of $50,000." *Id.* at 257. Accordingly, the portion of Bank's motion seeking to limit the amount Debtor can claim as exempt homestead to $10,000.00 is denied. Debtor may appropriately claim up to $50,000.00 as exempt homestead in the Main Parcel and Road Frontage Parcel.

The next issue confronting the court is whether Debtor's homestead exemption applies to the entirety of the Main Parcel and Road Frontage Parcel without apportionment. It is Bank's position that "lot of land" means that Debtor is strictly limited when claiming homestead to those portions of the property that are "residential in nature." The court has found few cases interpreting the homestead exemption under New York State law. The two most relevant cases, one from the Bankruptcy Court for the Northern District of New York and the other from the Bankruptcy Court for the Eastern District of New York interpret the New York homestead exemption differently.

The first case, *In re Hager,* applied the homestead exemption by looking to a debtor's use of the property and exempting only that percentage portion of the property used as a residence. 74 B.R. 198, 201 (Bankr. N.D.N.Y. 1987), *aff'd,* 90 B.R. 584 (N.D.N.Y. 1988). In *Hager,* a

11

portion of the debtor's home housed his chiropractic business. The court found that the roughly 13% of the debtor's home used as office space could not be claimed as exempt. *Id.* at 201. In analyzing the exemption pursuant to a 522(f) motion, the court calculated the amount of equity in the business portion of the home and held that the judicial lien attached only to the equity in the business portion. *Id.* at 202. On appeal, the district court affirmed, finding that the *Hager* court "properly excluded the office space in calculating Debtor's homestead exemption." *In re Hager*, 90 B.R. 584, 588 (N.D.N.Y. 1988).

The second case, *In re Vizentinis*, rejected the reasoning in *Hager* and interpreted the statute differently. 175 B.R. 824, 826 (Bankr. E.D.N.Y. 1994). In *Vizentinis*, the debtor owned property with a building containing four apartments, one of which she used as her principal residence. *Id.* at 824. The *Vizentinis* court found that the homestead exemption applied to the entire property and did not apportion the equity based on use. *Id.* at 826 ("We see nothing in CPLR § 5206 which limits the homestead exemption to only that portion of the lot of land which is entirely occupied exclusively as a principal residence."). The *Vizentinis* court reasoned that applying the homestead exemption involves a two-step process. The court must first determine whether the real property in question is a lot of land with a dwelling thereon, and only then decide whether the property is occupied as a principal residence. *Id.* at 826. If the answer is yes, the court does not further scrutinize the varied uses to which the residential property may be subject. The court found that its interpretation better supported the recognized "policy of interpreting exemptions broadly in order to provide the fresh start" for the debtor. *Id.* at 826.

Applying the reasoning in *Hager* highlights how courts could come up with very different numbers depending on how they assess and apportion space. The Bank would have the court exclude any portion of a building down to the square foot located on residential property qualifying as a homestead not used exclusively for "residential" purposes. Debtor would have

12

the court include all portions of a building located on property qualifying as homestead. The garage and storage shed dwarf the addition and trailer in a comparison based solely on square footage. In this sense, the current facts differ from those in *Hager*, as a chiropractic office utilizes square footage much differently than a large machinery shop or storage building.

The *Vizentinis* court also considered the difficulties presented by different fact patterns when applying an apportionment analysis. When apportioning homestead based on square footage, the court questioned how it should apportion homestead:

> [for] a homeowner who rents out one or more rooms on a permanent basis, or who rents out one or more rooms on an occasional basis, or who rents out some rooms on a permanent basis and also rents out one or more rooms on an occasional bases [sic], or who permits a close friend or a relative to occupy one or more rooms on a semi-permanent basis without paying rent, or who regularly receives "rent or other assistance from her spouse or resident working child"

175 B.R. at 826 n.6. The *Hager* analysis raises further questions as to home offices, especially those whose existence is permitted by applicable zoning laws only because they are attached to a residence. A court would have to determine whether such offices must also be apportioned according to square footage and removed from any calculation of homestead. In addition, a court would also have to consider at what point activities by the property owner would no longer be considered residential purposes and therefore effectively transform the space used for these activities into something other than homestead. All these considerations would not tend to produce uniform results when courts weigh and apply the *Hager* analysis.

The court must first determine the effect of the district court's affirmation of *Hager* on this court. If the district court's decision interpreting the homestead exemption is binding on this court, then this court must apply the *Hager* analysis to the claim of exempt homestead asserted before it. If not, then this court is free to independently consider the reasoning in the *Hager* case and adopt or reject it.

13

The issue of whether bankruptcy courts are bound by decisions of district court judges within the same district has not been definitively resolved. Most bankruptcy courts look to the provision of 28 U.S.C. section 151, which provides: "the bankruptcy judges in regular service shall constitute a unit of the district court to be known as the bankruptcy court for that district." 28 U.S.C. § 151. These courts reason that bankruptcy courts, as a unit of the district court, are not inferior courts and just as there is no "law of the district" mandated for district judges to follow, bankruptcy judges are likewise not bound by decisions of a single district court judge. *See* Paul Steven Singerman and Paul A. Avron, *Of Precedents and Bankruptcy Court Independence: Is a Bankruptcy Court Bound by a Decision of a Single District Court Judge in a Multi-judge District?*, 22 Am. Bankr. Inst. J. 1 (2003).

Judge Garrity of the Bankruptcy Court of the Southern District of New York espoused this view in *In re Jamesway Corporation*:

> Throughout this memorandum, and as relevant, we cite to *Grimmer*, 937 F. Supp. 255. We do so because we are persuaded that the court's holdings therein are correct and relevant to the issues that we address herein, not because, as the Union plaintiffs contend, we are bound by principals [sic] of stare decisis to follow it. We do not read *United State[s] v. Whiting Pools, Inc.*, 674 F.2d 144 (2d Cir. 1982) (cited by the Union plaintiffs), to hold otherwise. Rather, as relevant, that court, in recounting the procedural history of the case on appeal, only noted that the bankruptcy court believed itself bound by a district court decision with which it disagreed. *See id.* at 147. It did not consider the issue. We find that where the bankruptcy court sits in a multi-judge district, it is not bound by principles of stare decisis by the decision of a district judge in that district.

235 B.R. 329, 337 n.1 (Bankr. S.D.N.Y. 1999) (internal citations omitted).

The opposing view has been put forth by Judge Kaplan of the Bankruptcy Court for the Western District of New York:

> This writer has a deep respect for the scholarship by others to the effect that: (1) bankruptcy judges exercise the jurisdiction of the district court in bankruptcy matters; and (2) the bankruptcy courts, consequently, are not inferior courts for purposes of *stare decisis* analysis; and therefore (3) a bankruptcy judge is as free to differ with an earlier decision of a district court judge as would be a different district judge of that district....My own view (a dogmatic view, perhaps) is that

14

> any court whose decisions (even if unanimous) are subject to reversal by a single judge of another court is "inferior" to the reversing court for *stare decisis* purposes.

*In re Phipps*, 217 B.R. 427, 430 (Bankr. W.D.N.Y. 1998) (italics in the original). Later, Judge Kaplan further addressed the point in *In re Bruno*:

> This writer...is firmly of the view that each bankruptcy judge in a district served by more than one U.S. District Court Judge is bound by *stare decisis* to obey the decision of any one of those District Court Judges in a like case until a different U.S. District Court Judge of the same district disagrees with his or her peer's earlier decision, in which event each Bankruptcy Judge is free to go either way.

356 B.R. 89, 91 (Bankr. W.D.N.Y. 2006) (italics in the original).

In *In re McBrearty*, Judge Cyganowski of the Bankruptcy Court of the Eastern District of New York, seemed to bridge the issue. Although generally agreeing that bankruptcy courts are not bound by district court decisions, she felt compelled to follow two district court decisions where "*two* esteemed District Court Judges independently considered the rulings and rationale of [her] colleague, Judge Stan Bernstein, and affirmed his decisions." *Id.* at 518 (emphasis supplied).

In carefully considering this issue, this court respectfully concludes that principles of *stare decisis* do not control the outcome of the resolution of the matter before it and finds that it is not bound by the district court's affirmation of the *Hager* decision. Accordingly, this court is free to and chooses to adopt the reasoning of the *Vizentinis* court. Without compromising their homestead, debtors will be free to use their requisite discretion as to what is needed to best support themselves and their families. While these decisions may affect the interests of a chapter 13 trustee relating to additional income, they should not affect a debtor's rightful claim of homestead based on activities conducted on the site. Accordingly, this court finds that Debtor's claim of homestead exemption applies to the entirety of the Main Parcel and the Road Frontage Parcel without apportionment.

**522(f) Motion**

Section 522(f) of the Bankruptcy Code permits a debtor to "avoid the fixing of a lien on an interest of the debtor in property to the extent that such lien impairs an exemption…if such lien…is a judicial lien…" 11 U.S.C. § 522(f). The section also states in pertinent part:

> a lien shall be considered to impair an exemption to the extent that the sum of—
> (i)   the lien;
> (ii)  all other liens on the property; and
> (iii) the amount of the exemption that the debtor could claim if there were no liens on the property;
> exceeds the value that the debtor's interest in the property would have in the absence of any liens.

11 U.S.C. § 522(f)(2)(A). Debtor's claim of homestead, now recognized as exempt, must next be analyzed pursuant to Code section 522(f) to determine what portion of Bank's judicial lien, if any, Debtor may avoid. Crucial to this analysis is the value of Debtor's property. The burden is on Debtor to prove by a preponderance of the evidence the elements required to avoid a lien under Code section 522(f). *See In re Fox*, 353 B.R. 388, 393 (Bankr. D. Conn. 2006) (collecting cases).

Bank's judicial lien attaches to the value of Debtor's property that exceeds the value of all other liens on the property plus Debtor's homestead exemption of $50,000.00. The liens on the Main Parcel and Road Frontage Parcel are First Niagara Bank's mortgage lien of $66,375.94, Wells Fargo's mortgage lien of $7,294.38 and the IRS tax liens of $27,764.92, resulting in total liens of $101,435.24. Adding the exemption amount of $50,000.00 brings the total to $151,435.24. Bank's lien attaches to any property value above this amount. The value of the Main Parcel and Road Frontage Parcel determines whether and to what extent Debtor may avoid Bank's judicial lien.

Code section 522(a)(2) defines value as "fair market value as of the date of the filing of the petition." Debtor filed his petition on June 7, 2007. Bank's appraisal was for the value of the

16

property as of January 15, 2007, and Debtor's appraisal was for the value of the property as of February 21, 2007. The court finds both appraisals sufficiently contemporaneous with the petition date and acceptable as potential valuations of Debtor's property.

At first glance, there is a wide disparity between the two appraisals, with Bank's appraisal finding a value of $229,000.00 for Debtor's property and Debtor's appraisal finding a value of $168,000.00 for Debtor's property. Both appraisals included all three parcels, but at the hearing, each appraiser testified to the specific value attributed to the Main Parcel and the Road Frontage Parcel exclusive of the Third Parcel, with the Bank's appraisal at $166,000.00 and Debtor's appraisal at $146,900.00.[10]

In analyzing the appraisals, the court notes that Debtor's property is located in Cato, New York. Both appraisers noted in their appraisal reports that the Cato area is rural, and land use is primarily agricultural and recreational. The court also notes the difficulty each appraiser had in finding suitable comparable sales, as sales of land similar to Debtor's property are infrequent in Cato. The court first considers the appraisals as to land value and then considers them as they relate to the improvements value.

### *Land Value*

Bank's appraiser testified that one of the sales relied upon by Debtor's appraiser was not arms length, in that it was a parcel formerly owned by Debtor and sold while he was under financial distress. Debtor sold the parcel for the same price he paid for it some fifteen years earlier. Bank's appraiser also testified that the other two comparable sales were of limited help in determining the value of Debtor's property because they occurred in the year 2000. Due to their age, Bank's appraiser found them unhelpful and thus sought other comparable sales.

---

[10] Debtor's appraiser also included an addendum to his appraisal, giving the appraised value of each parcel. This addendum was admitted into evidence as part of Debtor's appraisal.

17

Due to the age of two of the comparable sales and the lack of an arms-length transaction on the other sale utilized by Debtor's appraiser, the court declines to consider them as indicators of the land value of Debtor's property. In addition, the court rejects the amalgam approach used by Debtor's appraiser that values tillable land equally with other land and accepts the Bank's separate valuation of tillable land.

*Improvements Value*

During cross examination of Bank's appraiser, Debtor's counsel elicited the fact that the comparable sales used by Bank's appraiser to determine the value of the improvements were all properties zoned commercial while Debtor's property is zoned residential/agricultural. In addition, a member of the Cato Planning Board, Rosemary Donnelly, testified that before Debtor's property could be used for a commercial purpose, an application for "spot zoning" would be required because Debtor's property is located in an area zoned residential/agricultural.

The court rejects the approach used by the Bank's appraiser because he relied on sales of land zoned for commercial use, and the court finds these sales not probative as to the value of Debtor's property, which is zoned for residential and/or agricultural use. Thus, the court finds both the improvements value derived from sales of commercial property and the $3,000.00 per acre figure derived from sales of commercial property used by Bank's appraiser inapplicable.

The court finds that the cost approach is the appropriate method of valuation in this instance. This finding is underscored by the fact that neither appraiser was able to find comparable sales of land zoned for residential/agricultural use improved by garage and storage buildings. The court will therefore use the value of the improvements arrived at by Debtor's appraiser through the cost approach.

The total acreage for the Main Parcel is 79.8 acres and the total acreage for the Road Frontage Parcel is 3 acres, totaling 82.8 acres, which this court finds is exempt as homestead.

18

Twelve acres of tillable land on the Main Parcel are rented out to a local farmer. Using the Bank's appraisal value of $1,250.00 per acre for tillable land, the value of the land rented to the farmer is $15,000.00. Using the Bank's appraisal value of $650.00 per acre for the balance of the land, the value is $46,085.00. Adding the $46,085.00 land value to the $15,000.00 land value and the $82,500.00 value of the improvements results in a total value for the Main Parcel and the Road Frontage Parcel of $143,585.00.

As discussed above, Bank's lien may be preserved only to the extent any property value above $151,435.24, the total of unavoidable liens and the applicable homestead exemption. Given the value of $143,585.00 found for Debtor's homestead property, there is no value above the senior liens and Debtor's homestead exemption to which Bank's lien can attach. Accordingly, Bank's lien is hereby avoided in its entirety as to the Main Parcel and the Road Frontage Parcel. It remains a lien of record against the Third Parcel. A separate order avoiding Bank's lien in accordance with this decision to be filed with the Cayuga County Clerk may be filed by counsel for the Debtor

So ordered.

Dated: April 20, 2009
Syracuse, New York

Hon. Margaret Cangilos-Ruiz
U.S. Bankruptcy Judge